JASON M. McCANN AND ALVIN E. McCANN
v.
CONTAINER PRODUCTS CORPORATION OF NORTH CAROLINA.
No. 2007 CA 0822.
Court of Appeals of Louisiana, First Circuit.
March 26, 2008.
WILLIAM M. HUDSON, III, LAWRENCE E. MARINO, Attorneys for Plaintiffs-Appellants (1st) Jason M. & Alvin E. McCann
JAY M. SIMON, Attorney for Defendant-Appellant (2nd) Container Products Corp. of North Carolina.
Before: CARTER, C.J, PETTIGREW, and WELCH, J.
PETTIGREW, J.
In this action for breach of contract, the trial court rendered judgment awarding compensation to plaintiffs for damages to property that they leased to defendant including restoration costs, lost rentals, consequential damages, and court costs. Defendant has appealed with respect to plaintiffs' alleged failure to mitigate their damages and the trial court's award of legal interest on expert witness fees. Plaintiffs have also appealed from the trial court's dismissal of their claim for attorney fees as well as the trial court's restriction of plaintiffs' claim for lost rent. For the reasons that follow, we amend, in part, and affirm.

FACTS
Container Products Corporation of North Carolina ("CPC), defendant herein, leased a commercial office/warehouse shop facility, situated at 11997 Airline Highway in Baton Rouge, from plaintiff Jason M. McCann, on or about December 13, 1999. The lease was for a two-year period from January 1, 2000 through December 31, 2001, for a total consideration of one hundred twenty thousand dollars ($120,000.00), payable in monthly installments of five thousand dollars ($5,000.00). CPC leased the commercial or light-duty site for use as a refurbishing center to sandblast and repaint 25,000-30,000 pound "T" tanks, 8,000-10,000 pound "roll-off" storage containers, as well as other tanks and equipment used in petroleum, chemical, or environmental remediation applications. The tanks would be brought to CPC's Baton Rouge facility where CPC would sandblast the old paint or rust from the tanks through the use of a steel grit and perform any necessary repairs. CPC would thereafter repaint the tanks.
Plaintiff Alvin E. "Rocky" McCann ("Rocky McCann")[1] testified that he readied the subject property for occupancy by CPC by replacing all carpet, cleaning and sprucing up the building and grounds, replacing the interior air handling units, and inspecting the electrical system and overhead heaters. Shortly after CPC assumed occupancy of the leased premises, Rocky McCann claimed that he fully cleaned out the septic tank, which was at the time free from rust and in serviceable condition. Plaintiffs assert that the property was in good condition and that CPC accepted the condition of the property without complaint.
Plaintiffs do not claim that the building was in brand new or perfect condition prior to the time CPC occupied the property. The facility has been in existence since 1968. Although the property was in good and fit condition for commercial or light industrial operations, the property clearly showed evidence of age together with some cracks in the parking lot prior to CPC's occupancy.
Plaintiffs claim that the damage resulting from CPC's occupancy of the subject premises was largely intentional and always grossly negligent. Due to CPC's failure to take reasonable steps in order to contain the metal sandblast medium and residue from its sandblast operations, metallic dust resulting from CPC's sandblasting operations was dumped in large quantities throughout the building, as well as into the plumbing and, ultimately, the septic system. Dust from the sandblast operations generally coated the interior of the warehouse. CPC made little or no effort to clean up the metallic dust from throughout the building.
CPC also failed to contain its painting operations. Paint was tested and sprayed against both the inside and outside walls, and was further tracked throughout the building. In addition, CPC employees generally abused the building. Employees of CPC drove forklifts into the walls and stairs, and even used a welding torch to cut a hole in a wall for the purpose of extending a doorway. An air-conditioning unit was also stolen. Office doors were punctured, and the building and offices were generally torn up.
CPC's operations were tightly controlled by its president and primary stockholder, Mr. C. Richard Johnston, who exercised exclusive authority over the refurbishing venture in Baton Rouge from CPC's home office in Wilmington, North Carolina. Mr. Johnston only traveled to Baton Rouge to lease the subject property and, thereafter, relied upon telephone reports from supervisors in Baton Rouge.
CPC's supervisor in charge of the Baton Rouge operation, Leroy Tucker, made no attempt to restrain his employees. Trial testimony indicated that Mr. Tucker even participated in the destruction of the premises by intentionally and repeatedly dragging and dropping large tanks around the parking lot thereby shattering the concrete.
Mr. Johnston died unexpectedly on November 16, 2000, and his widow assumed the duties of president of CPC. No one in the corporation's hierarchy had any knowledge of the status of CPC's Baton Rouge venture. In January 2001, Mr. Jeff Kahle assumed the duties of Director of Operations. Mr. Kahle was advised by CPC's accounting department that the Baton Rouge operation was not making enough money to pay its utilities.
Mr. Kahle testified that he travelled to Baton Rouge in early- to mid-January 2001, for the purpose of familiarizing himself with CPC's refurbishing operation. Mr. Kahle stated that he was disgusted with the condition of the building and the manner in which the operation was being run. According to Mr. Kahle, the Baton Rouge operation "just looked like total neglect and lack of caring on the part of the [CPC] employees." Realizing several weeks later that the Baton Rouge venture was hopeless, Mr. Kahle decided to close down CPC's operations at the subject property in Baton Rouge, on February 23, 2001.
CPC thereafter attempted to remedy some of the damage occasioned during its occupancy. Nevertheless, plaintiffs assert that the subject property was rendered unmarketable and unfit for lease until such time as it could be restored to its pre-lease condition. During the time the building remained vacant, vandals entered the property and caused additional damage to the interior. In addition, the failure to operate the air conditioning system resulted in increased humidity and further damage to the interior of the building.
Jason McCann and Rocky McCann, acting on behalf of themselves and the other owners of the subject property, instituted the instant litigation against CPC in East Baton Rouge Parish, on March 20, 2002. Plaintiffs confined the allegations of their petition to the damage resulting directly from CPC's occupancy. In response to the filing of plaintiffs' petition for damages, CPC filed various exceptions including peremptory exceptions raising the objections of nonjoinder of an indispensible party, no right of action and no cause of action together with a dilatory exception raising the objection of prematurity.

ACTION OF THE TRIAL COURT
Following a hearing on July 22, 2002, the trial court denied CPC's objections with respect to plaintiffs' nonjoinder of an indispensible party and no right of action. The trial court granted CPC's exceptions raising objections of prematurity and no cause of action with respect to plaintiffs' potential environmental damage claim and their failure to put forth sufficient allegations in their pleadings to support a claim against CPC for the intentional infliction of emotional distress. The court also gave plaintiffs thirty days within which to file an amended petition.
Following the filing by plaintiffs of a First Amended Petition on August 22, 2002, CPC reasserted its peremptory exception raising the objection of no cause of action together with its previously-filed dilatory exception raising the objection of prematurity. In addition, CPC put forth a motion for sanctions in the form of attorney fees and costs based upon plaintiffs' willful inclusion of environmental damage allegations previously adjudged to be premature. CPC argued that plaintiffs had failed to allege any additional acts beyond the terms and scope of the original lease contract and, thus, failed to state a cause of action in tort.
Plaintiffs thereafter filed a Second Amended Petition on July 28, 2003. CPC answered the second amended petition and put forth a reconventional demand against plaintiffs, seeking reimbursement for manpower and sums spent to prepare the leased premises for occupancy by CPC together with a demand for attorney fees.[2]
On July 5, 2005, CPC moved for a partial summary judgment and urged that plaintiffs are not entitled to recover attorney fees and litigation "management" fees advanced in connection with the instant litigation. Following an earlier hearing, the trial court signed a judgment on October 19, 2005, granting CPC's Motion for Partial Summary Judgment and ruling that plaintiffs are not entitled to recover attorney fees and litigation "management" fees advanced in connection with the present litigation.
This matter ultimately proceeded to a bench trial, and at the conclusion of the trial, the court requested that the parties submit post-trial memoranda. The trial court thereafter rendered judgment on December 19, 2006, in favor of plaintiffs and ordered CPC to pay damages totaling $479,987.92, together with all court costs and legal interest from the date of judicial demand. In written reasons for judgment, the trial court stated that it found the plaintiffs' position to be "almost entirely correct."
The trial court noted that:
Other than cutting off the obligation to pay lost rent at the end of a reasonable term  which this court finds to be 24 months @ $5,400.00 per month per the option period set forth in the lease  plaintiffs have provided overwhelming evidence of their entitlement to $339,893.00 in restoration costs, $129,600.00 in lost rentals, $10,494.92 in consequential damages, and court costs, including deposition costs of $2,047.35 and witness fees [totaling $17,000.00].
The trial court further noted that plaintiffs are also entitled to interest on this award, and as total damages were not ascertainable until a trial on the merits, the court awarded legal interest running from the date of judicial demand. In addition, the court specifically adopted and assigned as additional reasons for judgment "the well-reasoned Plaintiffs' Post Trial Memorandum," which the court attached to its own written reasons.
From this judgment, plaintiffs and CPC have taken separate appeals.

ISSUES PRESENTED FOR REVIEW
In connection with their appeal in this matter, plaintiffs present the following issues for review and consideration by this court:
1. Whether the trial court erred in limiting plaintiffs' lost rent to two years, when the court concluded that CPC massively damaged the property and rendered it unsuitable for lease;
2. Whether plaintiffs are entitled to lost rent for the entire five years that plaintiffs' property was unsuitable for lease due to the damage caused by CPC, through judgment requiring CPC to pay to repair that damage;
3. Whether plaintiffs are entitled to lost rent during the five months needed to perform the repairs to restore plaintiffs' property to leasable condition, after judgment requiring CPC to pay for the repairs;
4. Whether the trial court erred in dismissing plaintiffs' claim for attorney fees and costs when the lease provides for attorney fees and costs if CPC fails to surrender the property timely, the lease requires the property to be surrendered in the same condition as when it was leased except for ordinary wear and tear, and CPC left the property massively damaged and unleaseable due to the nature and extent of the damage.
CPC has also appealed from the judgment of the trial court and presents several additional issues for disposition by this court:
1. Was it error by the trial court to award loss of rents for the two year period wherein plaintiff made no effort to mitigate damages?
2. Was it error by the trial court to award legal interest on witness fees, taxed as court costs, accruing from the date of judicial demand instead of from the date of judgment?

STANDARD OF REVIEW
The Louisiana Constitution of 1974 provides that the appellate jurisdiction of the courts of appeal extends to both law and facts. La. Const., art. V, § 10(B). A court of appeal may not overturn a judgment of a trial court absent an error of law or a factual finding that is manifestly erroneous or clearly wrong. See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882, n. 2 (La. 1993). When the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and enter a judgment on the merits. Rosell v. ESCO, 549 So.2d 840, 844 n. 2 (La. 1989).
In the assessment of damages in cases of offenses, quasi offense, and quasi contracts, much discretion must be left to the trier of fact. La. Civ. Code art. 2324.1. The standard for appellate review of general damage awards is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award but, rather, to review the exercise of discretion by the trier of fact. Millican v. Ponds, 99-1052, p. 6 (La. App. 1 Cir. 6/23/00), 762 So.2d 1188, 1192. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. Youn, 623 So.2d at 1260.

DISCUSSION

Lost rental income
In connection with their respective appeals in this matter, both plaintiffs and CPC take issue with the trial court's award of two years of lost rental income on the property.
Plaintiffs assert that their property was massively damaged through the intentional acts of CPC's employees thereby rendering the property unsuitable for lease. Plaintiffs further assert that their property remained in said condition for the five years that it took to obtain a judgment against CPC, and that once a judgment was rendered, the repairs necessary to restore the property to a condition suitable for lease took five months. Plaintiffs seek additional lost rent incurred during this period. CPC contends that as plaintiffs made no effort to mitigate their damages, the trial court erred in awarding plaintiffs two years of lost rentals.
At the trial of this matter, Danny Watts[3] and Robert Smith, commercial real estate brokers in the Baton Rouge area whose respective firms represented 90 percent of the market, testified that they were familiar with the subject property and confirmed that prior to plaintiffs' lease to CPC, the property was in good condition and easily marketable. The damage to the property occasioned during CPC's occupancy was documented extensively through videotapes and witness testimony and evident through the trial court's on-site inspection. Mr. Watts and Mr. Smith both testified that given the abuse that the property had sustained, together with the risk of fire or electrocution with respect to the electrical system, the risks of discharge from the septic system, and the risk of accidents due to the damaged rear and side concrete lots, the property was no longer marketable.
Plaintiffs argue that pursuant to Louisiana Civil Code articles 1994 and 1996, a lessee, even if he is in good faith, is liable to his lessor for foreseeable damages arising from the lessee's breach of his lease or other failure to perform. Should a lessee be found to be in bad faith, he is liable to his lessor for all damages, whether foreseeable or not, that are a direct result of the lessee's failure to perform. La. Civ. Code art. 1997. Plaintiffs further argue that either way, damages are measured by the loss to the lessor and the profit of which he has been deprived. La. Civ. Code art. 1995.
Plaintiffs take the position that pursuant to the terms of its lease, CPC was obligated, at the end of the lease period, to surrender the leased premises in as good condition as received, less ordinary wear and tear. This CPC failed to do, and the trial court concluded that plaintiffs had provided overwhelming evidence of their entitlement to $339,893.00 in restorative costs.
As a result of the extensive damage sustained by the subject property during the period of CPC's occupancy, plaintiffs assert that it was reasonably foreseeable that the property would be unsuitable for lease and that plaintiffs would incur a loss of rent. Pointing to Mr. Kahle's admission at the trial that CPC failed to live up to its lease obligation to act in good faith, plaintiffs argue that said admission renders CPC liable for all damages, whether foreseeable or not, resulting from its breaches of the lease. Plaintiffs claim that inasmuch as repairs were not performed until the rendition of a judgment in December 2006, they are entitled to five years and five months of lost rentals.
Pursuant to the terms of the lease agreement between CPC and the plaintiffs, CPC was granted an option to renew its lease on the subject property for an additional 24 months at a rate of $5,400.00 per month. Plaintiffs claim that the rent to which they would have been entitled to during 2002 and 2003 would have been calculated at a rate of $5,400.00 per month, multiplied by 24 months, which amounted to $129,600.00.
In addition, plaintiffs point to the testimony of Mr. Watts and Mr. Smith who stated that the rental price for commercial real estate in the Baton Rouge area increased at the rate of 10 percent every two years; thus, plaintiffs claim that the lost rent for 2004 and 2005 was 10 percent more than $5,400.00 per month, or $5,940.00 per month. Multiplied by 24 months, the rent that plaintiffs claim that they lost during 2004 and 2005 amounted to $142,560.00.
Beginning in the year 2006, the fair rental rate for plaintiffs' building increased an additional 10 percent, but coupled with this were significant changes in the Baton Rouge real estate market stemming from the aftereffects of Hurricane Katrina that resulted in the rapid escalation of rental rates for commercial real estate throughout Baton Rouge. According to the testimony of Mr. Smith, plaintiffs could have obtained a rental rate of $9,000.00 per month for their building throughout 2006 and 2007. Multiplied by an additional 12 months, plaintiffs claim that they lost an additional $108,000.00 in rent during 2006. As a result of the damage occasioned by CPC's breaches of its lease, plaintiffs claim to have lost $380,160.00 in rental on their property through the date of judgment.
Plaintiffs further assert that even if CPC had paid the judgment on the date it was rendered, they could not have re-leased their property immediately due to the five months it took to perform the necessary repairs. As a result, plaintiffs argue that CPC is also liable to them for the rent that they lost during the five months that it took to restore the property to a condition suitable for lease. At $9,000.00 per month multiplied by five months, this additional loss of rent totals $45,000.00. In total, plaintiffs claim that they lost $425,160.00 in rent; namely, $380,160.00 for the initial five years that the building was unoccupied and $45,000.00 for the five months that it took to perform repairs.
In its written reasons for judgment, the trial court awarded plaintiffs the sum of $129,600.00 for the rent which plaintiffs lost as a result of their inability to lease their property. The court arrived at this sum through application of the rental rate of $5,400.00 per month for 24 months during 2002 and 2003 that was agreed to by the parties and set forth in the option clause contained in the lease agreement. Plaintiffs claim that there exists no basis in the record to support a conclusion that two years is a "reasonable" time for the recovery of lost rent rather than the five years and five months that plaintiffs claim was established through uncontradicted testimony and evidence at trial. Plaintiffs argue that they are entitled to recover lost rent until such time as the property is restored to suitable condition. Upon application of the $129,600.00 in lost rents that the trial court awarded to plaintiffs in its judgment, plaintiffs assert that this court should increase said award by an additional $295,560.00.
CPC argues that pursuant to La. Civ. Code art. 2002, a lessor is obligated to make reasonable efforts to mitigate the damage caused by his lessee's failure to perform. When a lessor fails to make such efforts, a lessee may demand that his damages be reduced. Rocky McCann testified at trial regarding the dust resulting from CPC's sandblasting operations that had been dumped in large piles throughout the building and his concern for the effect said dust would have on the building's air-conditioning, plumbing, and septic systems. CPC points out that despite his concerns, Rocky McCann testified that he made little or no effort to clean up the metallic dust from throughout the building as he was "waiting on CPC to do it." CPC asserts that plaintiffs had a duty to take reasonable steps to minimize the extent of their damage such as conducting a simple clean-up of the premises. CPC further asserts that it was unreasonable for plaintiffs to wait five years for the rendition of a judgment before making any effort whatsoever to lessen the damages that they sustained.
Additionally, CPC points to the fact that in connection with his testimony at trial, Rocky McCann admitted that he would periodically get telephone calls from people who inquired about the possibility of leasing the subject property. Mr. McCann testified that he:
considered about half of them to be nuisance and inquisitive phone calls, ... but [he] would get, every so often, a call, and somebody would say, are you interested in leasing the building. There was no offer made. There was no discussion made, and [Rocky McCann] would just say, no, I'm not interested. Thank you, and [he] would hang up the phone.
Upon review of these assignments and careful examination of the record in this matter, we find no error in the trial court's decision to restrict the plaintiffs' claim for lost rentals to two years following the termination of their lease with CPC. Although the plaintiffs put forth testimony relative to the damage to their property and the increased rental value for commercial real estate, particularly following Hurricane Katrina, Rocky McCann flatly declined to investigate whether an acceptable lease could be negotiated. Accordingly, we find this issue to be without merit.

Claim for attorney fees and costs
The next issue raised by plaintiffs is whether the trial court erred in granting, prior to trial, CPC's motion for partial summary judgment and dismissing plaintiffs' claims for attorney fees and costs that plaintiffs claim they are entitled to pursuant to the terms of the lease agreement.
With respect to these claims, plaintiffs rely on Section 12 of the lease between themselves and CPC that provides, in pertinent part, as follows:
12. At the expiration of this lease, or its termination for other causes, Lessee is obligated to immediately surrender possession within a two (2) weeks notice, and should Lessee fail to do so, he consents to pay any and all damages, but in no case less than five times the rent per day, with 25% attorney's fees, costs, etc.
Plaintiffs argue that while CPC vacated the premises at the expiration of the lease, it left the property unfit and unsafe for leasing to subsequent tenants. To avoid liability for attorney fees, plaintiffs contend that CPC was required to "surrender" the premises in its pre-lease condition. Plaintiffs also contend that the trial court erred in similarly dismissing their claim for expert management fees that plaintiffs assert were costs.
In granting CPC's motion for partial summary judgment, the trial court opined in pertinent part:
[Section] Twelve [of the lease agreement] is solely where they vacate the property. And so those attorney's fees are those attorney's fees, in this court's reading of this contract, and it's very clear on its face, meant only with regard to the failure to vacate. [Section] Six [of the lease agreement] has to do with the failure to put the property back in its pre-lease condition, less ordinary wear and tear and whatever damages you can get for that, but there's [sic] no attorney fees associated with that action. There's no doubt that they did, in fact, surrender possession. So I'm going to grant the summary judgment with regard to the issue of attorney fees. Now, let's turn to the issue of management fees.
. . . .
. . . The court has reviewed the management fees that are being requested. They are quite akin to attorney fees. Attorney's fees are not recoverable in here. Any plaintiff who is pursuing their claim, it cost them their time and effort to do it. That's not normally recoverable as a result of the breach of the contract. I am going to grant the summary judgment with regard to management fees. They are not recoverable against this defendant. I'll sign an order upon presentation.
We agree. Like the trial court, we interpret Section Twelve of the lease agreement to permit a lessor to recover attorney fees and costs in the event a lessee should fail to surrender possession of the premises timely upon the expiration of the lease. Although CPC surrendered possession of the premises timely, CPC failed to return the premises in good condition, less ordinary wear and tear, as required by Section Six. Said failure serves as the basis for plaintiffs' claim for damages for breach of contract. Plaintiffs are not entitled to recover attorney fees and costs. This issue is without merit.

Award of legal interest on witness fees
The final issue raised by CPC is whether the trial court erred when it ordered that legal interest on the fees of expert witnesses accrue from the date of judicial demand rather than from the date of judgment.
The trial court, in its written reasons for judgment, set forth the fees associated with various expert witnesses who testified live or by deposition on behalf of the plaintiffs. The trial court further noted, "Plaintiffs are also entitled to interest on this award. As total damages were not ascertainable until a trial on the merits, legal interest will run from the date of judicial demand. As additional Reasons for Judgment, the court adopts and assigns the well-reasoned Plaintiffs' Post Trial Memorandum, attached hereto."
A court has authority to render a "judgment for costs." La. Code Civ. P. art. 1920. Expert witness fees are taxed as costs and, once fixed, form part of the final judgment. La. R.S. 13:3666. Courts have great discretion in assessing court costs. Cajun Electric Power Cooperative v. Owens-Corning Fiberglass Corporation, 616 So.2d 645, 647 (La. 1993). Interest accrues on an award of expert witness fees taxed as court costs from the date of judgment fixing such fees. Id.
Despite the great discretion afforded the trial court, we nevertheless conclude that the trial court erred in awarding interest on expert witness fees taxed as court costs from the date of judicial demand. We hereby amend that portion of the trial court's judgment to provide that interest on the trial court's award of expert witness fees taxed as court costs accrue from the date of judgment fixing such fees.

CONCLUSION
For the reasons set forth above, the trial court's judgment is amended in part, and as amended, affirmed. All costs associated with this appeal shall be assessed against plaintiffs.
AMENDED IN PART, AND AS AMENDED, AFFIRMED.
NOTES
[1] Alvin E. "Rocky" McCann, additional plaintiff herein, is the father of plaintiff Jason M. McCann, and either the father or uncle of the other owners of the subject property. Rocky McCann, Jason McCann, and the other owners of the subject property are collectively referred to herein as "plaintiffs." Rocky McCann does not possess an ownership interest in the subject property, but is the lead plaintiff in this litigation by virtue of powers of attorney executed by the other owners of the property. Rocky McCann testified that he owns and manages real estate and is experienced in the management of commercial and industrial properties. Rocky McCann managed the subject property and acted as agent in this litigation for the owners other than Jason McCann.
[2] CPC later supplemented and amended its reconventional demand to include a third party claim against Ray White, who, CPC claimed, stored various pieces of equipment at the leased premises without authorization, which he thereafter failed to remove despite repeated requests that he do so. CPC moved prior to trial to dismiss its third party claim against Mr. White at its costs.
[3] Mr. Watts' firm, Sealy & Falgoust, brokered plaintiffs' lease to CPC.